UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| RUBEN GARCIA, JR.,<br>    Plaintiff,<br><br>-v-<br><br>TITLE CHECK, LLC,<br>    Defendant, | )<br>)<br>)   No. 1:20-cv-724<br>)<br>)   Honorable Paul L. Maloney<br>)<br>)<br>) |

## OPINION

This matter is before the Court on Defendant Title Check, LLC's motion to dismiss Plaintiff Ruben Garcia, Jr.'s complaint (ECF No. 11). For the reasons to be explained, the Court will grant the motion.

### I.

This case, filed on August 4, 2020, alleges that Title Check, LLC, has violated the Racketeer Influenced and Corrupt Organizations ("RICO") act[1] and participated in innumerable unjust enrichment claims by charging buyers of foreclosed homes a 10% fee.

This case is tangentially related to the deluge of litigation this Court has seen regarding the Michigan General Property Tax Act ("GPTA").[2] Title Check handles parts of the tax foreclosure sale process for over 60 counties throughout the state. According to the complaint, after a property owner fails to pay his taxes and "forfeits" the property to the county, Title Check steps in and handles the remainder of the process from notice to sale.

---

[1] 18 U.S.C. §§ 1961-1968.
[2] M.C.L. § 211.1, *et seq.*

At the eventual auction, Title Check charges property purchasers a 10% fee. The complaint hinges on the allegation that because neither the GPTA nor the contract between Bay County and Title Check allow Title Check to charge such a fee, it is illegal.

Plaintiff Ruben Garcia, Jr., attended a foreclosure auction on August 8, 2018 in Bay City. At that auction, he was aware that Title Check created an "auction book" that listed the starting bid for the properties up for sale (ECF No. 9-6). The auction book also included the relevant "rules and regulations" for the foreclosure sales, including a section governing the "terms of sale" which provided that "[t]he full purchase price consists of the final bid price *plus* a buyer's premium of 10% of the bid price, any outstanding taxes due on the property including associated fees and penalties, and a $30.00 deed recording fee." (*Id.* at PageID.298.) Garcia admits that he was "told and reminded" of these terms of sale before placing the winning bid on a property (First Amended Complaint, ECF No. 9 at ¶ 51). He agreed to and paid the following price: the $11,500 winning bid, a $30 deed fee, an $1,150 buyer's premium, and $1,680.73 in summer taxes, for a total of $14,360.73 (ECF No. 9-13). Interestingly, Garcia does not take issue with the deed fee or the summer taxes not being included in the minimum bid.

After the sale, he received an Auction Receipt, which reiterated the terms of sale, and included a Buyer's Affidavit (*Id.*). Garcia signed the Affidavit, which affirmed that he had "read, underst[oo]d, and agree[d] to the above Terms of Sale as well as any additional terms, conditions, and restrictions printed in sale booklets, posted at the sale site, on http://www.tax-sale.info, or made verbally at the location of sale on the day of the auction." (*Id.* at PageID.371.)

2

Now, Garcia alleges that the buyer's premium—the 10% fee—violates the RICO act because it was extortion and wire fraud, and it was unjust enrichment because Title Check may not charge a buyer any cost beyond the minimum bid imposed by the GPTA. Garcia has pleaded "on behalf of himself an all others similarly situated," though he has not filed a motion to certify a class. Title Check has filed a motion to dismiss the complaint for failure to state a claim (ECF No. 11).

## II.

A complaint must contain a short and plain statement of the claim showing how the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A defendant bringing a motion to dismiss for failure to state a claim under Rule 12(b)(6) tests whether a cognizable claim has been pled in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide sufficient factual allegations that, if accepted as true, are sufficient to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, and the "claim to relief must be plausible on its face." *Id.* at 570. "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). If plaintiffs do not "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When considering a motion to dismiss, a court must accept as true all factual allegations, but need not accept any legal conclusions. *Ctr. For Bio-Ethical Reform*, 648 F.3d at 369. The Sixth Circuit has noted that courts "may no longer accept conclusory legal allegations that do not include specific facts necessary to establish the cause of action." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1050 (6th Cir. 2011). However, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"; rather, "it must assert sufficient facts to prove the defendant with 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Rhodes v. R&L Carriers, Inc.*, 491 F. App'x 579, 582 (6th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). The Court considers the complaint itself and the documents attached to the complaint. Fed. R. Civ. P. 10(c).

### III.

The heart of Garcia's argument is simple: because the GPTA does not explicitly authorize the 10% buyer's premium as part of the statutory "minimum bid," it prohibits Title Check from charging such a fee.

At the time Garcia purchased his property,[3] the GPTA defined the minimum bid as follows:

---

[3] The GPTA has since been amended, effective January 1, 2021. P.A. 2020, No. 255.

> "Minimum bid" is the minimum amount established by the foreclosing governmental unit for which property may be sold under this section. The minimum bid shall include all of the following:
>
> > (i) All delinquent taxes, interest, penalties, and fees due on the property. If a city, village, or township purchases the property, the minimum bid shall not include any taxes levied by that city, village, or township and any interest, penalties, or fees due on those taxes.
> >
> > (ii) The expenses of administering the sale, including all preparations for the sale. The foreclosing governmental unit shall estimate the cost of preparing for and administering the annual sale for purposes of prorating the cost for each property included in the sale.

M.C.L. § 211.78m(16)(a).

At a foreclosure auction, the foreclosing governmental unit has broad discretion "to adopt procedures governing the conduct of the sale and the conveyance of parcels under this section[.]" M.C.L. § 211.78m(2). But to sell the property, the foreclosing governmental unit must receive at *least* the minimum bid, so that the foreclosing governmental unit "breaks even" on the sale. *Rafaeli, LLC v. Oakland County*, 952 N.W. 2d 434, 483-485 (Viviano, J., concurring) (Mich. 2020); M.C.L. § 211.78m(2).

Garcia argues (without citing any portion of the GPTA) that the inclusion of the buyer's premium is contrary to the express terms of the GPTA: he argues that silence is not authorization. Absent any statutory support or caselaw, the Court does not find this argument persuasive. The GPTA is clear that the minimum bid is just that: a minimum. It sets a floor, rather than a ceiling, price. Properties may not be sold under the minimum bid amount, but the GPTA does not forbid property to be sold for a price larger than the minimum bid. That minimum bid "shall include" several enumerated costs, and Garcia's position rests on the idea that this list is an exhaustive list—any fee or cost not listed after "shall include" may not

be included. This interpretation runs afoul of well-established principles of statutory interpretation.

The Michigan Supreme court has stated that both "the meaning accorded the word 'include' by ordinary common usage," and the "effect generally given it by the courts unless the context clearly indicates a contrary legislative intent," support the proposition that the word "include" serves to "enlarge rather than limit." *Skillman v. Abruzzo*, 88 N.W.2d 420, 422 (Mich. 1958); *see also Michigan Bell Tel. Co. v. Dep't of Treasury*, 518 N.W.2d 808, 812 (Mich. 1994) ("When used in a statutory definition, the word 'includes' is a term of enlargement, not of limitation."). That is so because the word "includes" "conveys the conclusion that there are other items includable, though not specifically enumerated. Such a definition suggests, if not requires, a construction broad enough to encompass other items not explicitly mentioned." *Michigan Bell*, 518 N.W.2d at 812 (quoting 2A Singer, Sutherland Statutory Construction (5th ed.), § 47.07, pp. 151-156) (internal quotation marks and citation omitted). When applied to the GPTA, this is logical: consider a property on which the county performed environmental or demolition work, and the county sought to recover those costs via an add-on cost at the time of sale. It would be contrary to one of the purposes of the GPTA—to allow counties to "break even" on properties—to forbid the county from collecting those costs simply because they are not enumerated in the minimum bid section of the GPTA. Put simply, the GPTA outlines a floor price for the sale. The word "include" does not appear to exclude other costs.

Garcia does not address this argument at any length in his response, nor does he provide any alternative reading of the statute beyond his general proposition that the

6

enumerated fees are the only fees allowable. The Court finds his position unconvincing. Absent this foundational element, the enumerated claims in the complaint crumble.

### Count I: RICO

To "prove the elements of an underlying RICO violation," a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *American Biocare Inc. v. Howard & Howard Attorneys PLLC*, 702 F. App'x 416, 421 (6th Cir. 2017). In addition, plaintiffs must "show that the RICO violation was the proximate cause of the injury to his business or property." *Id.* "Racketeering activity consists of acts which are indictable under a number of federal statutes listed in 18 U.S.C. § 1961(1)(B)." *Heinrich v. Waiting Angels Adoption Servs. Inc.*, 668 F.3d 393, 404 (6th Cir. 2012). Garcia identifies two predicate acts: extortion and wire fraud.

The complaint fails to allege that Title Check engaged in extortion. Under 18 U.S.C. § 1951, " 'extortion' means obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). As this text makes clear, extortion "has two different theories of liability. Extortion can occur either (1) through the threat of force, violence, or fear; or (2) through 'the color of official right'—i.e., by a public official." *United States v. Watson*, 778 F. App'x 340, 345 (6th Cir. 2019). Extortion under color of official right "require[s] some quid pro quo. This means that the victim gave up her property to the public official in exchange for something else." *Id.* "In other words, extortion by a public official" under color of official right is "the rough equivalent of what we would now describe as 'taking a bribe.' " *Id.* (quoting *Evans v. United States*, 504 U.S. 255, 260 (1992)).

Garcia argues that Title Check was acting "under color of official right" by pretending that its actions were authorized by the GPTA, and thus committed extortion. This argument fails for two reasons. First, as outlined above, Title Check's actions were authorized by the GPTA, so there was nothing improper or illegal happening. And second, there is no allegation of a quid pro quo or a bribe. In fact, Garcia knew *before* the auction that the buyer's premium would be charged, and he agreed to pay that fee. No one forced or pressured him to purchase the property, and Garcia was not provided anything in exchange for paying the buyer's premium. The complaint fails to plead the predicate act of extortion.

Turning to the allegation that Title Check engaged in wire fraud: here, Garcia must show (1) a scheme to defraud, and (2) use of the wires "in furtherance of the scheme." *Heinrich*, 668 F.3d at 404. "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005). "A plaintiff must also demonstrate *scienter* to establish a scheme to defraud, which is satisfied by showing the defendant acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information." *Heinrich*, 668 F.3d at 404. When making these allegations, a plaintiff must "satisfy the heightened pleading requirements of Rule 9(b)" and "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 270 (6th Cir. 2008) (quotation marks omitted)).

Garcia's argument here is that Title Check's assertions that it was "entitled to demand, charge and obtain a buyer's premium of 10% of the bid price by operations of law is/was fraudulent and/or not authorized by law." (First Amended Complaint, ¶ 75.) Again, this argument fails for two reasons. First, nothing about the buyer's premium appears to be illegal. Second, Garcia does not specifically identify any false statements. Indeed, he was told of the terms of sale before bidding on the property he ultimately purchased, and he was reminded of the terms of sale after purchasing the property. Title Check was as clear as can be, and the buyer's premium was disclosed in multiple places. Nothing was fraudulent, so Garcia has failed to plead the predicate act of wire fraud.

Absent pleading the elements of any predicate act of racketeering activity, Garcia's RICO claim must be dismissed.

### Count II: Unjust Enrichment

For an unjust enrichment claim, Garcia must show (1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to the plaintiff because of the defendant's retention of the benefit. *Belle Isle Grill Corp. v. Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003). If both elements are established, "the law will imply a contract in order to prevent unjust enrichment." *Id.* That said, it is well established that a contract will not be implied where an express contract governing the same subject matter exists. *Id.*; *Skaggs v. Nationstar Mortgage, LLC*, No. 1:16-cv-1048, 2017 WL 1371077, at *5 (W.D. Mich. Apr. 17, 2017) (unjust enrichment claim "fails because there was a contract covering [defendant's] conduct and the benefit it received").

That is the case here. There is a contract that governs the transaction at issue: the buyer's premium is expressly included in the Terms of Sale. In his amended complaint, Garcia attempts to evade dismissal by alleging that any contract was between him and the foreclosing governmental units and created at the fall of the auction hammer, rather than between Garcia and Title Check. But the Michigan Courts have repeatedly rejected this type of argument, finding that when an express contract exists that governs the subject matter of the lawsuit, even if that contract is not between the named parties, there can be no claim for unjust enrichment. *See, e.g., Martin v. East Lansing School District*, 483 N.W.2d 656 (Mich. Ct. App. 1992). This prevents "an express and implied contract covering the same subject matter at the same time." *Campbell v. City of Troy*, 202 N.W.2d 547 (Mich. 1972).

There exists an express contract that governs the merits of Garcia's claim. He read and was reminded of the terms of sale both before and after the sale; Those terms of sale were the terms he accepted by placing the winning bid. Because those terms are memorialized in an express contract, there can be no quasi-contract claim for unjust enrichment. And in any event, all parties received exactly what they bargained for under the contract—as outlined above, Title Check was as clear as day when it disclosed the buyer's premium. Garcia's unjust enrichment claim is meritless and must be dismissed.

## IV.

In short, the Court finds no support for Plaintiff's position in the GPTA or elsewhere. Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion to dismiss the complaint (ECF No. 11) is **GRANTED**.

Judgment to follow.

**IT IS SO ORDERED.**

Date: April 29, 2021                                     /s/ Paul L. Maloney
                                                        Paul L. Maloney
                                                        United States District Judge